UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DONNA MAE LEITNER,

        Plaintiff,

vs.

JOHN E. POTTER,

        Defendant.

_____/

Case No. 1:09-cv-274

Hon. Hugh W. Brenneman, Jr.

## OPINION

Plaintiff[1], proceeding *pro se*, has filed a suit pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. ("Title VII") and the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq*. (the Rehabilitation Act"). Plaintiff named two defendants, John E. Potter and the Equal Employment Opportunity Commission ("EEOC"). The EEOC has been dismissed from this action. This matter is now before the court on Potter's[2] motion for summary judgment (docket no. 56) and "Plaintiff's motion to file brief in excess of 25 pages for a Fed. R. Civ. P. 56(f) continuance and/or to reopen discovery and/or for a temporary stay in proceedings and/or to amend answer to defendant's motion for summary judgment and/or to amend the case management order" (docket no. 100).

---

[1] Plaintiff, Donna Mae Leitner, is sometimes referred by her former name of Donna Mae Castle-Ebright.

[2] Unless otherwise stated, the court will refer to the remaining defendant, John E. Potter, as either "Potter" or "defendant."

## I.    Background

### A.    Events giving rise to the current dispute [3]

Plaintiff's claims arise from four separate incidents: plaintiff's request for accommodations on November 28, 2001 and subsequent denial of accommodations on January 26, 2002; management's refusal to fill out her workers compensation ("OWCP") forms on January 24 and 29, 2002; and plaintiff's termination from employment on March 9, 2002.

In May 1997, plaintiff was offered a position as a night tour or "Tour 1" Manual Distribution Clerk with the United States Postal Service ("Postal Service") in Lansing, Michigan. NCF at p. 2; Leitner Dep. at pp. 8-9 (docket no. 57-2).  On her first day of work on June 21, 1997, Automation Supervisor Ina Thomas, told plaintiff that "she would not have to work directly with Karen Ungerman," a woman who had an affair with plaintiff's husband. *Id.*  Plaintiff worked on the Automation area (the "floor") for the first time on June 23, 1997. *Id.*  Plaintiff claims that she was harassed by Dosie Maasen, whom plaintiff identified as a clerk in charge of the floor and who was responsible for "his crew."  Leitner Dep. at pp. 10-11.  Plaintiff testified that Maasen harassed her regarding her husband's affair. *Id.*  Specifically, that "Dosie Maasen assigned Karen Ungerman to train plaintiff" even though plaintiff informed Maasen that she had been advised by Ina Thomas she "would not have to work with Ungerman."  NCF at p. 2.[4]  Plaintiff worked with Ungerman on June

---

[3] The factual background is derived primarily from the parties' "Joint Chronology of Facts," which contained both "non-controverted facts" and "controverted facts."  *See* docket no. 98. Citations to the parties' "non-controverted facts" as set forth in the Joint Chronology of Facts will be cited in this opinion as "NCF at p. __" and "controverted facts" will be cited as "CF at p. __."  The court notes that the Joint Chronology refers to Ms. Leitner at times as "PL" or "Plaintiff."  For purposes of clarity, when quoting the NCF's in this opinion, the court will refer to Ms. Leitner as "plaintiff."

[4] The Joint Chronology sometimes refers to Dosie Maasen as "Dosie Massen."  The court will use the correct spelling of his name when quoting from the Joint Chronology.

24, 1997. *Id.* When Ina Thomas was on a two-week vacation, Maasen continued to harass plaintiff when he assigned her to be trained by Ungerman. *Id.* at p. 3. On August 15, 1997, plaintiff resigned from the Postal Service. *Id.* at p. 5. Plaintiff stated as her reason for the resignation as "I felt harassed by a specific supervisor and fell into a deep clinical depression and could not cope with the schedule change conflict." Plaintiff's Resignation (docket no. 57-3 at p. 2). On the same date, plaintiff received a Notice of Removal stating that she was terminated for failing to report as scheduled during probation. NCF at p. 5.

Plaintiff contends that from June 1997 through July 1998, she suffered from workplace abuse, Post Traumatic Stress Disorder (PTSD) triggered from the abuse, stress, lack of sleep and other symptoms. CF at p.3. Plaintiff was hospitalized for psychiatric treatment from May 22 through 28, 1998. NCF at p.5.

Plaintiff requested to be rehired in July and August 1998. *Id.* at p.5. The Postal Service denied her request on August 13, 1998, because she did not complete her probationary period. *Id.* at p. 6. Plaintiff filed an EEO Complaint, which was settled on August 29, 1998. NCF at pp. 6-7. Plaintiff's alleged that she was forced to resign due to harassment and unfair treatment by her supervisor, Dosie Maasen, from June 21st through August 15th. 1997. *See* 1998 EEO complaint (docket no. 57-3); Leitner Dep. at pp. 18-19. The EEO claim was settled on August 27, 1998, when plaintiff was given a 90-day probationary processing position. *See* docket no. 57-3 at p. 6. Plaintiff successfully completed the probationary period and began work on Tour 1 automation in December 1998. NCF at pp. 7-8.

Maasen returned to the facility on December 14, 1998, and worked at the same shift as plaintiff. *Id.* at p. 8. Plaintiff contends that her shift presented a hostile work environment upon

Maasen's return. CF at p. 8. Plaintiff submitted a note from a social worker which stated that she was being treated for a depressive episode suffered in 1997 related to PTSD and that she should be protected from working with that particular supervisor (i.e., Maasen). NCF at p. 9. Plaintiff also contends that Ungerman harassed her on December 22, 1998. CF at p. 9. Pursuant to a grievance settlement in December 1998, plaintiff was allowed an "indefinite" position on a different shift, Tour 2. NCF at p. 10; Leitner Dep. at pp. 17-18. Plaintiff worked at the Postal Service through 1999, 2000 and 2001, accumulating numerous absences that were both authorized and unauthorized. NCF at pp. 10-30.

On July 28, 2001, a supervisor told plaintiff that Maasen would be working on the machine closest to her work area. NCF at p. 25. Sometime in August 2001, plaintiff asked Mr. Mike Medlock[5] if he could stop Maasen from transferring to plaintiff's work area. *Id.* at p. 26. Mr. Medlock advised plaintiff that there was nothing he could do to stop the transfer because Maasen had legally bid and been awarded the position. *Id.* Plaintiff testified at her deposition that working in close proximity to Maasen caused her to suffer panic attacks. Leitner Dep. at pp. 24-27. Maasen was not her supervisor at the time, but merely a clerk who worked near her. *Id.* Maasen worked about 8 to 10 feet from plaintiff, and engaged in "cussing and yelling and slamming things" while he worked. *Id.* at p. 26. In order to avoid working near Maasen, plaintiff began leaving work early, before Maasen's shift. *Id.* at p. 31. Plaintiff testified that in August and September 2001, she could perform her job, provided that Maasen was not working near her. *Id.* at p. 32.

---

[5] Mr. Medlock was the manager of the Postal Service's processing and distribution center. *See* FAD at p. 15.

After Maasen began working, plaintiff was absent from work for "unscheduled sick leave" on the following dates: August 18th, 21st, and 22nd; and September 5th, 8th and 19th. NCF at pp. 26-29. In addition, plaintiff left work early on the following dates: August 24th; and, September 11th, 12th, 13th, 14th, and 18th. *Id.* at pp. 27-29. Plaintiff was also listed as tardy on August 31st. *Id.* at p. 27.

Plaintiff met with Ms. Barb Martin (the "Installation Director") on September 9, 2001, to discuss an accommodation. NCF at p. 29. After that date, plaintiff sometimes left cryptic notes regarding her requested absences. When plaintiff left early on September 18th, she noted on the form regarding the absence:

> EEO Violation. Management refusal to honor EEO and keep Dosie Maasen from my work area when they have a whole floor!!! I have asked every night!!

NCF at p. 29. Ms. Martin disapproved the request. *Id.* On September 21st, plaintiff filled out a request for sick and administrative leave "ASAP" stating:

> EEO Violation. Mgmt refused to comply w/documented EEO info.

*Id.* at pp. 29-30. This request was also disapproved. *See* docket no. 57-6 at p. 11.

On September 28the, plaintiff received "a Notice of Suspension of 14 days for failing to maintain regular attendance from 8/18/01, to 9/19/01." NCF at p. 30.[6] During this time period, plaintiff had irregular attendance on 14 days. *See* Notice of Suspension (docket no. 57-5).[7] The majority of plaintiff's absences were categorized as unscheduled sick leave, with two absences based

---

[6] After plaintiff grieved the suspension, an arbitrator reduced it in October 2002 to "a seven day paper suspension." NCF at p. 30.

[7] This was not plaintiff's first suspension for poor attendance. On September 8, 2000, plaintiff received a 14 day suspension for missing 29 days of work between July 5, 2000 and August 11, 2000. *See* docket no. 57-5. Plaintiff filed a grievance which was settled and resulted in a seven day paper suspension. *Id.*

upon tardiness and one absence classified as unscheduled leave without pay in lieu of sick leave. *Id.* Only one of these absences (August 3st) was approved by a supervisor. *See* docket no. 57-6 at p. 8.

After that date, plaintiff continued to request time off with cryptic notes to management as well as an adjustment to her work schedule. On September 29th, plaintiff filled out a form asking to leave 2.29 hours early, stating:

EEO failure to comply. MGMT failure to protect.

NCF at p. 30. This request was disapproved by Ms. Martin. *Id.* On October 5th, plaintiff requested "leave without pay and sick leave," noting on her request. "Why can't you send me to your Dr?" *Id.* at p. 31. This request was disapproved as absent without leave (AWOL). *Id.* On October 12th, plaintiff submitted a request for temporary schedule change for personal convenience until October 19, 2001. *Id.* The request was approved. *Id.* On October 16th, plaintiff requested to leave work "ASAP" because of:

mgmt failure to follow proper Hazmat procedure following 'white powder' (Anthrax) find [sic]. Hard to find ___ masks.

*Id.* The request was disapproved. *Id.* Then, on November 9th, plaintiff's supervisor prepared a form regarding plaintiff's tardiness, which she "refused to sign." *Id.*

November 15, 2001 was the last day that plaintiff reported to work at the Postal Service. NCF at p. 31. According to plaintiff, Mr. Doug McFarland told her that "if she leaves work early one more time, upon Maasen's arrival, that he will terminate her." CF at p. 31. According to plaintiff, she could no longer "return to work without risking the loss of her job" because she could no longer leave the building when Maasen arrived (an event which allegedly triggered plaintiff's PTSD). *Id.* at p. 31.

On November 23, 2001, plaintiff called the Postal Service's attendance control line and informed a supervisor, Herman Fulgram, that she would be out indefinitely and that she would not continue to call her in absences. NCF at p. 31. Mr. Fulgram told plaintiff that "she needed to give a duration and continue to call in periodically." *Id.* Three days later, plaintiff called the attendance line. The parties stipulated that the following conversation occurred:

> [Plaintiff] inquired of Herman if she had heard him correctly the night before and he told her than she did not have to call each night and that she should update the attendance control lin, 'periodically.' He confirmed that was correct."

*Id.* at p. 32.

On November 28th, plaintiff submitted a letter to Barb Martin requesting a "reasonable accommodation," and stating that she had PTSD "as a direct result" of her previous employment and subsequent separation from the Postal Service. *Id. See also,* 11/28/01 letter, Exh. 10 to defendant's brief (docket no. 57-11). In her request, plaintiff stated that she "would be willing to accept a position in another facility, even if it meant reduction in hours, to not have to continue to deal with the problems I have had at the USPS." *Id.* Plaintiff characterized her conditions as follows:

> I have had to take strong nerve medications to be able to even walk through the doors of that post office, a fact of which I have made management repeatedly aware of. I have been sent home to get these same meds by a supervisor, who refused to address the real issue, and who obviously thought medicating me was the simplest solution. I have been hospitalized as a direct result of my employment there and I have additional documentation which clearly states that I was having an allover body inflammation as a direct result of stress in the workplace. Prior to my employment with your organization, I have never filed for workers compensation or for unemployment. I have no prior history of psychological treatment. I have nothing anywhere in any of my medical records that will reflect (severe) depression or a need of any type of mood control medications, prior to my employment with the USPS. I have at least fourteen additional psychological documents that I have never submitted to the USPS, all separate, regarding various incidences that pertain directly to events that took place at the post office. Instead of correcting the problem, your

organization has instead added red mark upon red mark into my personal files and attempted to discipline me from every angle.

I do not feel that I have ever had a fair and equal opportunity to work in a quiet and peaceable environment, at that post office, since my first day of employment there. I do not feel that your offices are able to accommodate me. I would like to add that I was in no way a contributor to any of the events that took place that originally caused this problem; nor have I contributed to any events that caused its acceleration. If your establishment had addressed the problem, legally and/or ethically, in the beginning, it would not still be a problem today. If your offices finally decide to make the situation correct and whole, honestly and ethically, this problem will cease. If any one in your offices can suggest to me how I an ever going to be afforded a fair opportunity to be able to move freely among the tours and the supervisors and the employees there without the entire history of what has gone on before haunting me . . . I am a willing and avid listener to such claims and advice.

*Id.* (emphasis added).

Plaintiff further advised the Postal Service of her intent to take legal recourse against the organization if they failed to meet her demands, stating that she had already contacted the EEO Office, the "local unemployment office," the Michigan Department of Labor, "the Labor Relations Board," and that she had "contracted an attorney in Southfield to investigate my paperwork and possible violations." *Id.* Plaintiff further stated:

This is my last and final attempt to secure equal employment in your organization. Your failure to respond in a timely manner (not six weeks) is going to be construed by me to assume that you are not considering this matter to be serious and I will proceed with alternative methods to be made "whole and complete," per the national and local contracts.

*Id.*

The parties agree that plaintiff was absent from work from November 24th through November 30th, 2001. NCF at p. 32. Her absence was eventually designated as "AWOL." *Id.* On December 11th, Ms. Martin requested that the human resources department make a recommendation "for whatever necessary accommodation" was appropriate to plaintiff's situation. *Id.* On January

8

3, 2002, the "Reasonable Accommodation Committee" sent a letter to Mr. Doug Lovett (a manager in "process and distribution"), stating that the committee "determined that reasonable accommodation consideration is not required" and that the "committee's decision is based on the fact that Ms. Castle-Ebright's impairment does not significantly impact a major life activity and is not supported by current medical documentation." NCF at pp. 32-33. Mr. McFarland sent a letter to plaintiff on January 15, 2002, which notified plaintiff: that she had been absent; that she had not called in to request leave; that she must provide medical documentation to justify her absences; and that she was required to report to work on January 22nd for a pre-disciplinary meeting. NCF at p. 33. Plaintiff subsequently contacted the Postal Service and made an arrangement to meet on January 24th. NCF at p. 33.

On January 21st, three days before the re-scheduled pre-disciplinary hearing, plaintiff received a letter from Jack G. Jesse, Ph.D., which was directed to her physician, Dave Peters, D.O., and summarized her condition as follows:

> Please be advised that Donna has returned for counseling related to symptoms that have been exacerbated by her workplace environment. She describes symptoms of chest pains, pains in upper back, constriction in her throat, insomnia, crying a lot, avoiding people and places, irritability, and even suicidal thoughts. She expressed anger at having been placed in a work situation where she has to be in contact or close proximity to the person that initially precipitated her symptoms. In short, she is having posttraumatice stress disorder response.

> Medical confirmation that these symptoms are stress related and not of a physical origin would be appreciated.

*See* docket no. 57-13 at p. 33; NCF at p. 33. It is unclear from the record as to whether this letter was presented to the Postal Service.

Plaintiff's request for a reasonable accommodation was denied in a letter from Mr. Lovett, dated January 23, 2002, "for the reason that the Reasonable Accommodation Committee

determined that plaintiff's impairment does not 'significantly impact a major life activity and is not supportable my [sic] current medical documentation.'" NCF at p. 33. The letter provided plaintiff with the following options: "bid to an alternate position within your craft; request permanent light duty (this must be accompanied by acceptable medical documentation); or request a transfer to another facility (for this you must contact the facility in writing)." *Id.*[8]

Plaintiff attended the pre-disciplinary meeting on January 24th with her union steward, Barbara Barnum, and Mr. McFarland. *Id.* at p. 34. Plaintiff told McFarland "that she was not able to report to work due to her PTSD and that she was waiting for the Reasonable Accommodation Committee to respond to her." *Id.* The parties stipulated that plaintiff submitted a medical form from Dr. Peters that stated:

> Patient needs to follow EEO [sic]. Diag: Anxiety Disorder / Post Traumatic Stress Disorder or not work."

*Id.* Ms. Barnum wrote in her notes "that McFarland refused to accept medical documentation from plaintiff because he 'claimed it was not a return to work form.'" and "that nothing Donna has said would suffice to [unintelligible] keep her from being disciplined." Barnum Notes, Exh. 9 to plaintiff's response (docket no. 91-9). The parties stipulated that "McFarland was unable to help plaintiff with workers compensation forms because McFarland told plaintiff 'he did not know of any OWCP case pending.'" NCF at p. 34. According to plaintiff, Ms. Barnum's notes reflect that Mr. McFarland refused to help plaintiff with the workers compensation forms, stating that he needed "a live claim." CF at p. 34; *see* Barnum Notes (docket no. 91-9).

---

[8] Plaintiff did not receive this letter until January 26th, after the pre-disciplinary meeting. NCF at p. 33.

On January 25th, Mr. McFarland "submitted paperwork to management for plaintiff's removal." NCF at p. 35. On January 26th, plaintiff finally received the January 3rd letter from the Reasonable Accommodation Committee setting forth its findings. NCF at p. 35. Plaintiff asserts that on January 29th Al Crudup, a manager of distribution operations at the Postal Service,[9] "refused to assist plaintiff with workers compensation forms." CF at p. 35. However, there is no evidence in the record that Mr. Crudup took any action on that date.[10]

On February 12, 2002, the Postal Service issued a "Notice of Removal" to plaintiff, which stated that she would be removed from the Postal Service on March 9th as the result of absences without leave (AWOL). NCF at p. 36. The letter provided in pertinent part as follows:

> You have not been at work since November 16, 2001. On November 23, 2001, at approximately 1830, you called the attendance control line and state that you would be off work indefinitely. You were told that you needed to give a duration as to how long you would be off, and you were also told that you needed to continue to call in to report your absence from duty. You did not continue to report your absences, as instructed, and you continued to be absent from duty. On January 15, 2002, you were scheduled for a pre-disciplinary meeting during which you were offered an opportunity to explain why you had been absent from duty and when, if ever, you expected to return to work. You have offered many alleged problems that you are dealing with, such as Post Traumatic Disorder, problems with EEO complaints, problems working with certain other employees, along with other reasons. You also stated that you were not going to return to duty until Barb Martin responded to concerns you had with your bid job. You have offered no reasonable explanation to justify your continued unauthorized absence from duty and to date you have not provided any medical documentation to justify your absences. Your absences from duty have therefore been considered as AWOL.

Notice of Removal, Exh. 11 to defendant's brief (docket no. 57-12). The letter pointed out that plaintiff's actions violated the five sections of the Employee and Labor Relations Manual: 666.51

---

[9] Mr. Crudup is a manager of distribution operations at the Postal Service. *See* Crudup EEO Investigative Affidavit, Exh. 17 to plaintiff's response (docket no. 91-17).

[10] Plaintiff cites her Exhibit 9 in support of her claim against Mr. Crudup. *See* docket no. 91-9 at p. 5. However, this citation does not support her claim against him. *See* discussion, *infra*.

(Protests); 375.2 (Unsatisfactory Performance); 511.43 (Employee Responsibilities); 666.81 (Requirement for Attendance); 666.82 (Absence without Permission); and 666.86 (Disciplinary Action). *Id.* In reaching this determination, the Postal Service considered plaintiff's previous work history, which included a seven day suspension (September 8, 2000) and a fourteen day suspension (September 28, 2001). *Id.*

On the same day that she received the notice of removal, plaintiff faxed a second request for reasonable accommodation as well as a letter to Dr. Peters to authorize release of medical records to the Postal Service Human Resources. NCF at p. 36. On February 20th, plaintiff and Ms. Barnum met with Mr. Crudup to request assistance in filing workers compensation forms. NCF at p. 36. Mr. Crudup called supervisor Richard Hansen, from a different department and directed Hansen to assist plaintiff with the forms. *Id.* Mr. Hansen agreed to meet with plaintiff and Ms. Barnum "but said that since he was not presently the plaintiff's supervisor he was not able to properly notate the forms because he was not aware of the medical problem that plaintiff was experiencing." *Id.* On that same date, plaintiff requested EEO counseling and filed a grievance. *Id.*

On February 21st, plaintiff was advised that a different department (referred to by the parties as "Grand Rapids Medical") needed additional medical documentation regarding her condition. NCF at p. 37. On February 25th, plaintiff submitted a request: for light duty; that she not have contact with "persons named in EEO;" that she have lifting restrictions; and "that she be restricted from exposure to elements that provoke anxiety." *Id.* On that same date, Dr. Peters authored a letter to the Postal Service regarding plaintiff's condition. *Id.* In the letter, the doctor stated that the "predominate theme" in his treatment of plaintiff involved "a stress reaction involving

12

her personal life as it was affected by certain individuals at her work place" which resulted in a hospitalization in May 1998. Dr. Peters' Letter (Feb. 25, 2002), Exh. 7 attached to plaintiff's response (docket no. 91-7). The doctor noted that on various occasions, he restricted plaintiff's work place interactions "to avoid the direct stressors and individuals which precipitate anxiety and perpetuate her depressive episodes." *Id.* The doctor stated that plaintiff had a diagnosis of "Post Traumatic Stress syndrome" which would affect her "on and off for life." *Id.* The doctor also noted that plaintiff had chronic back and neck pain, which should be treated by lifting restrictions of 30 pounds, with breaks every 1 to 2 hours as needed. *Id.* The doctor gave the following opinion regarding her ability to work:

> I see no reason that this individual cannot work if given the opportunity to have these restrictions. If there are no job place restrictions then the employee should not be working. She as of this letter is able to work 2/25/02, with the understanding of her situation and restrictions.

*Id.*

Plaintiff was cleared to return to work by "Grand Rapids Medical" as of February 25, 2002, with accommodations nearly identical to those listed by Dr. Peters:

> 1. Restrict and limit exposure to those elements that provoke her anxiety. This is a permanent restriction; 2. No lifting greater than 30 pounds, with periodic breaks recommended every 1-2 hours as needed; 3. If there are no job place restrictions then the employee should not be working.

NCF at pp. 37-38.

On March 1, 2002, plaintiff submitted a letter seeking reconsideration of the January 23rd denial of her reasonable accommodation request. NCF at p. 38. In her letter, plaintiff stated that she had "other documents available, which include emergency room treatments for mental health issues." *Id.* On March 5th, plaintiff made a verbal request to Mr. Crudup for an

accommodation.  *Id.*  The parties stipulated that "Crudup responded that 'Restrictions are too vague to approve or disapprove, who are persons named in EEO [sic] restrict and limit exposure to what elements need clarity.'"  *Id.*  On that date, plaintiff also submitted a request for light duty with the medical documentation of January 24th and February 25th.  *Id.*  That same morning, Ms. Suzanne Surrell of the "Grand Rapids Medical" contacted the Postal Service via facsimile with the following message:

> Good Morning, Additional documentation has been received this morning from employee's treating physician stating that she was not able to work from 09/01/01 through 03/04/02, and she is to have zero contact with the persons named in her EEO.  This documentation is dated 3/4/02.

*Id.*  Then, on March 8th, the Postal Service denied plaintiff's February 25th request for light duty. NCF at p. 39.

### B.    Plaintiff's removal from employment and arbitrator's decision reinstating her employment

Plaintiff was removed from her employment with the Postal Service as of March 9, 2002.  NCF at p. 40.  The removal was overturned the next year in *In re arbitration between USPS v. American Postal Workers Union, AFL-CIO*, APWU Case No. 020213 (July 31, 2003) (the "July 31, 2003 arbitration decision") (docket no. 91-8).  The arbitration decision reinstated plaintiff's employment, but did not award her any back pay or resolve the issue of her need for a reasonable accommodation:

> Despite the need for finality on both sides in this case, I am unable to direct that the grievant be returned to active work until such time as the issue of her RA [i.e., reasonable accommodation] is resolved.  However, having found that she was unjustly removed in March, 2002, I direct that the removal be expunged from her record, and that she be reinstated to the rolls of the Postal Service in a Medical Leave of Absence (MLOA) status without loss of seniority or other benefits.  Since grievant has not shown that she was able to work for the Employer at all during the period of her removal, and chose to pursue the RA route rather than one of the options offered

to her on January 23, 2002, she shall not be awarded any back pay as a remedy for her unjust removal in this case. However, this finding should not be interpreted as a lack of entitlement to any monetary remedy which may be determined to be appropriate in the context of her RA case.

At the time that grievant presents medical evidence to the Employer establishing that she is able to return from her MLOA to either her bid position, without accommodation or as a result thereof, or to a different position to which her rights under the contract entitle her, the Employer shall reinstate her to active service upon a finding of her fitness for duty. At the conclusion of the EEO case establishing whether or not grievant is entitled to RA in this workplace, the parties are directed to meet to determine whether grievant's MLOA status should be continued, and for what period of time, and to address what her options are at that point. The arbitrator retains jurisdiction to deal with any issues that may result from effectuating this remedy.

*Id.* at pp. 23-24.

The arbitrator made the following award in plaintiff's favor:

The grievance is sustained. Since the Employer did not establish the charge of AWOL, the removal was not for just cause. Grievant shall be reinstated to the rolls of the Postal Service on a Medical Leave of Absence without back pay, and the parties shall meet at the conclusion of the resolution of the EEO Reasonable Accommodation issue to discuss grievant's options for continued employment at that point.

*Id.* at p. 24.

## C. The EEO proceedings

While plaintiff contested her termination through the union grievance process and

arbitration, she also pursued relief under the Postal Service's EEO procedures. Three days before

her termination, plaintiff signed a Postal Service "Information for Pre-Complaint Counseling" form.

*See* docket no. 57-4 at pp. 2-6. On April 21, 2002, plaintiff signed an "EEO Complaint of

Discrimination in the Postal Service," which alleged sex discrimination, disability discrimination

and retaliation. *See* EEO Complaint (docket no. 57-4).[11] In her complaint, plaintiff alleged that the discrimination occurred on five dates in 2002: January 24th; January 26th; January 29th; March 9th and March12th. *Id.* Plaintiff set forth the following specific allegations (in her words):

> I believe I was discriminated against based on physical disability, mental disability and retaliation. On Jan 24, 02, Doug McFarland refused to assist me in filling out OWCP forms (and multiple previous x's).[12] On Jan. 29, 02, Al Crudup refused to help me fill out OWCP forms. On Jan. 26, 02, Doug Levett refused me reasonable accommodations (after a 5 month delay from initial request). On March 9, 02, I was effectively terminated by Doug McFarland & Al Crudup. On March 12, 02, I was made aware that Karla Barber & Doug Lovett (acting for Barb Martin) illegally took my bid job.

*Id.* Plaintiff sought the following relief (in her words):

> To be made whole, with: complete restoration; all loss pay compensated; all loss bonuses awarded; all loss benefits awarded; to not suffer further harassment, retaliation or discrimination; all loss sick and annual (related to accusations) restored; all discipline records (related to accusations) cleaned and cleared[]; all loss interest awarded; all overtime losses per lists awarded; all step increases/seniority restored; all retroactive pay per contract arbitration awarded. [Illegible] to honor/respect disability needs.

*Id.*

During the course of the investigation, plaintiff obtained two letters from health care providers. In a letter dated July 29, 2003, a counselor at St. Joseph Mercy Health System noted that she saw plaintiff on July 22nd. *See* docket no. 91-12. At that time, plaintiff reported depression, anxiety and stated to the counselor that she suffered from PTSD and that she suffered abuse as a child. *Id.*

---

[11] The court notes that the parties' Joint Chronology erroneously states that plaintiff signed and mailed her "EEOC Formal Complaint [sic]" on March 6th as opposed to April 21st. NCF at p. 39.

[12] "OWCP" is an acronym for Office of Workers Compensation.

Dr. Peters also issued a letter on July 29, 2003, which he characterized as a follow-up to his letter of February 25, 2002. *Id.* Dr. Peters stated that after reviewing "an extensive amount of additional data, including Psychological evaluation, office notes, doctor evaluations, family letters and assessing [plaintiff] today, I am convinced that she has a permanent disability that substantially limits her in major life activities." *Id.* The doctor states that "[s]he is not to work" and that she is permanently disabled and unable to manage her daily affairs. *Id.* The doctor noted that plaintiff was seeing a psychiatrist, and agreed with the diagnoses of major depressive disorder, PTSD and panic disorder with suicide ideation. *Id.* The doctor felt that plaintiff's suicide ideation may resolve "without the continuing trauma of a workplace." *Id.* The doctor also opinion that plaintiff may be able to function minimally in a low stress environment and under close supervision being able to leave the said environment when the need arises. *Id.* It is unclear from the record whether plaintiff submitted this documentation as part of the EEO investigation.

After performing a lengthy investigation, the Postal Service issued a Final Agency Decision ("FAD") on March 16, 2004. *See* FAD (docket no. 57-14). The FAD summarized plaintiff's claims as follows:

> Complainant alleged discrimination on the bases of sex (Female), mental disability (PTSD / borderline disorder / mixed anxiety disorder) and retaliation when: 1) on January 24 and January 29, 2002, management refused to fill out her OWCP forms; 2) on January 26, 2002 she was denied accommodations; 3) on March 9, 2002 she was terminated from employment; and 4) on March 12, 2002 her bid job was taken.

FAD at p. 1. After reviewing these claims in considerable detail, the Postal Service closed the case "with a finding of no discrimination based on sex, mental disability, and retaliation." *Id.* at p. 16.

Plaintiff appealed the FAD to the EEOC, Office of Federal Operations ("OFO") pursuant to 29 C.F.R. § 1614.405. *See Donna M. Castle-Ebright v. John E. Potter*, Appeal No.

01A42465, 2005 WL 1714465 at *1 and n. 2 (EEOC OFO, July 15, 2005).[13] The EEOC identified

plaintiff's claims as discrimination against her on the bases of sex, disability and reprisal for prior

EEO activity on these occasions:

> (1) on January 24 and January 29, 2002, management refused to fill out complainant's Office of Workers Compensation (OWCP) forms;
>
> (2) on January 26, 2002, complainant was denied accommodations;
>
> (3) on March 9, 2002, complainant was terminated from employment; and
>
> (4) on March 12, 2002, complainant's bid job was taken.

*Id.* (footnote omitted). The EEOC did not address plaintiff's claim (4) (i.e., the "bid job" claim)

because she withdrew that claim from consideration.[14]

The EEOC affirmed the FAD in findings with respect to claims (1) and (3), stating

in pertinent part as follows:

> In its FAD, the agency concluded that complainant failed to establish a prima facie case of disability discrimination because she failed to show that she is substantially limited in any major life activity. The FAD noted that the evidence of record indicates that complainant was limited in her ability to perform her job, but only while in the presence of a particular individual (C1) [i.e., Dosie Maasen] with whom complainant had a personal history that was upsetting to her. The FAD additionally noted that complainant did not show that a similarly situated individual not in her protected class was treated more favorably under similar circumstances. The FAD further found that complainant did not establish that management's actions were motivated by discriminatory animus.

---

[13] A copy of the EEOC appeal is attached to defendant's brief as part of Exh. 13. *See* docket no. 57-14.

[14] The EEOC explained:

"The FAD dismissed this claim for untimely EEO Counselor contact. We note that the record contains a letter dated July 14, 2003, in which complainant requested that this particular claim be withdrawn. Accordingly, we will not address it further."

*Id.* at n. 2.

As to the sex discrimination claim, the FAD found that complainant failed to establish a prima facie case. Specifically, the FAD found that complainant did not identify a similarly situated male, who was treated more favorably under similar circumstances. The FAD further found that complainant did not establish that management's actions were motivated by discriminatory animus. Finally, as to retaliation, the agency concluded that complainant failed to show that the challenged actions followed any protected EEO activity within such a period of time that a retaliatory motive could be inferred. The FAD additionally found that complainant failed to establish a causal connection between her protected activity and the claims in this complaint. The FAD concluded that complainant did not establish that management's actions were motivated by retaliatory animus.

As to the denial of reasonable accommodation claim, the FAD found that by letter dated November 28, 2001, complainant requested reasonable accommodations for Post Traumatic Stress Disorder. The FAD found that complainant's requested accommodations were never to have to work around C1 [i.e., Dosie Maasen], to work in a stress free environment without abuse and to be given an assignment outside of the facility. On or about January 23, 2002, complainant was notified that the Reasonable Accommodation Committee had determined that a reasonable accommodation for complainant was not required. The decision was based on the Committee's finding that complainant's impairment does not significantly limit a major life activity, and that the request was not supported by current medical documentation.

On appeal, complainant contends that the agency should be held in "default" for failing to issue its FAD sooner. Complainant raises no new arguments concerning the merits of the case. The agency requests that we affirm its FAD. As this is an appeal from a FAD issued without a hearing, pursuant to 29 C.F.R. § 1614.110(b), the agency's decision is subject to de novo review by the Commission. 29 C.F.R. § 1614.405(a).

Initially, we agree with the agency that complainant fails to establish that the agency's actions were motivated by intentional unlawful discrimination. Thus we conclude that under the theory of disparate treatment, complainant's claims of sex, disability and retaliatory discrimination fail. Regarding claim (1), there is no persuasive evidence to establish that the agency refused to cooperate with complainant's efforts to file OWCP forms. Regarding claim (3), complainant fails to prove, by a preponderance of the evidence that unlawful animus motivated her termination. The record establishes that complainant's attendance was "abysmal" and the excessive absenteeism was the basis for her removal.

See Donna M. Castle-Ebright, 2005 WL 1714465 at *1-2 (footnotes omitted).

In addition, the EEOC affirmed the FAD with respect to plaintiff's claim (2) for reasonable accommodation:

> [T]he Commission turns its attention to claim (2) and whether complainant was denied reasonable accommodation in violation of the Rehabilitation Act between November 2001 and March 2002. For purposes of this decision, we assume *arguendo* that complainant was an individual with a disability at the time of the alleged discrimination. Thus, we next determine whether complainant was a qualified individual with a disability. A "qualified individual with a disability" is an individual with a disability who satisfies the requisite skill, experience, education and other job related requirements of the employment position such individual holds or desires, and who, with or without reasonable accommodation, can perform the essential functions of the position. 29 C.F.R. § 1630.2(m). With respect to whether complainant is a qualified individual with a disability, the inquiry is not limited to the position actually held by the employee, but also includes positions that the employee could have held as a result of job restructuring or reassignment. *See Van Horn v. United States Postal Service*, EEOC Appeal No. 01960159 (October 23, 1998).
>
> Upon review of the record, the evidence establishes that complainant's request for reasonable accommodation stems from her inability to work with a certain individual who apparently precipitates complainant's anxiety and perpetuates her depressive episodes. We conclude from this and the fact that the agency did make several attempts to transfer complainant away from this individual at the Lansing Processing and Distribution Center, that the only effective accommodation would have been to reassign complainant to a different postal facility.
>
> The Commission has held that an agency's failure to conduct an appropriate search for a new position for complainant will not, by itself, result in a finding of discrimination. *See Barnard v. United States Postal Service*, EEOC Appeal No. 07A10002 (August 2, 2002). Rather, complainant has an additional evidentiary burden in reassignment cases. Complainant must present sufficient evidence to support a finding that, more likely than not, there was a vacant funded position, for which she was qualified and to which she could have been reassigned. Absent evidence of a particular vacant funded position, the fact that a vacant funded position existed may be inferred based on documentary or testimonial evidence regarding, inter alia: (1) complainant's qualifications; (2) the size of the agency's workforce; and (3) indicia of postings and/or selections during the pertinent time period within classes of jobs for which complainant would have been qualified. *Id.* Complainant ultimately did not avail herself of the opportunity to participate in a hearing or otherwise develop this evidence, and the record before us does not establish that, more likely than not, there was an accommodation which would have enabled complainant to perform the essential functions of her position or that there was a

vacant funded position, for which she was qualified and to which she could have been reassigned.

We therefore conclude that complainant failed to carry her burden of proof to establish, by a preponderance of the evidence, that she was a qualified individual with a disability within the meaning of the Rehabilitation Act. *See Bielfelt v. United States Postal Service*, EEOC No. Appeal 01A10475 (June 19, 2002). Thus the agency is not liable for denying complainant a reasonable accommodation between November 2001 and March 2002. For the reasons stated herein, the Commission concludes that the agency is not liable for violating either Title VII or the Rehabilitation Act. Accordingly, we AFFIRM the agency's final decision.

*Id.* at *2-3 (footnotes omitted).

### D. Plaintiff's subsequent employment history with the Postal Service

On April 3, 2008 (approximately two and one-half years after plaintiff filed this action in the United States District Court for the Western District of Washington, *see* § E.1., *infra*), "Doug Lovett sent a letter to plaintiff's prior address where she resided until December 15, 2006 requesting that plaintiff return to work with documentation to support her absences." NCF at p. 45.[15] The Postal Service mailed a "Notice of Removal" to plaintiff on June 5, 2008. The parties addressed this issue in a stipulation as follows:

USPS mailed Notice of Removal with the following charges: 1. Failure to follow instructions and report to work as directed or supply documentation to support your current absence in resulting [sic] in a charge of AWOL: On April 3rd, a certified letter (letter #) [sic] was mailed to your address of record requiring you to provide documentation to support your continued absence. The letter was signed for by Kenneth Castle. You did not respond nor was any documentation provided to local management to support your absence. On April 24th, 2008, a certified letter was sent to you to attend a Pre-Disciplinary meeting. You did not respond or attempt to contact local management. As you have failed to respond and have failed to contact management you are considered AWOL.

---

[15] The court notes that the parties' citation to support this fact set forth in the Joint Chronology is incorrect. The cited exhibit, docket no. 91-21, is a statement from an unknown person stating in pertinent part that "[a] letter was issued by Dorothy Monroe on April 04, 2008, requesting that the employee return to work with documentation to support her absences. The letter was sent to the employee's former address, and was never received by the employee."

*Id.* Plaintiff's removal was effective on July 19, 2008. *Id.*

### E. Plaintiff's federal lawsuit

### 1. Proceedings in the Western District of Washington

On October 24, 2005, plaintiff filed a complaint in the Western District of Washington against John E. Potter and the EEOC. *See* docket no. 4.[16] In her complaint, plaintiff alleged that she brought this action pursuant to Title VII, and complained of the following acts by defendants: failure to employ me; termination of my employment; failure to promote me; and "[o]ther acts" which plaintiff identified as follows:

> Disability: Failure to provide reasonable accommodation.
> Injury: Failure to assist with OWCP claims.
> Discrimination: Bid job taken; and failure to allow to work bidded jobs.

*Id.* Plaintiff alleged that defendants' conduct was discriminatory with respect to a "disability" and a "marital relationship." *Id.* The "disability" was identified as: post traumatic stress disorder (PTSD); "borderline disorder;" "mixed anxiety;" and "DI" [sic]. *Id.* The "marital relationship" was identified as "originally began due to whom married to." *Id.*

Plaintiff alleged the following "basic facts" surrounding her claim of discrimination: June 1997 ("Emotional injury & abuse after being forced to work under unbearable conditions"); August 1997 ("Constructive (forced) termination"); December 1998 ("Placed into extremely hostile work environment"); April 1999 ("Refused OWCP"); July 1999 ("Refused OWCP"); August 2001 ("Forced to work in hostile environment"); September 2001 ("Forced to work in hostile environment"); September 2001 ("Bid job taken"); September 2001("Refused bid job"); January

---

[16] The court notes that plaintiff's complaint was received on October 13, 2005, but was not filed until October 24th, when the court granted her motion for leave to proceed *in forma pauperis*. *See* docket nos. 1, 3 and 4.

2002 ("Medical documentation refused / RA denied"); and March 2002 ("Terminated against contract"). *Id.*

Plaintiff alleged that the discrimination "originally began June 1997" and occurred on August 1, 2001. *Id.* Plaintiff further alleged that she filed charges with the EEOC on August 18, 2002. *Id.* Plaintiff added that the EEOC charges were filed "originally" in August 1998. *Id.* The EEOC's right to sue letter was received by plaintiff on July 20, 2005. *Id.* Plaintiff sought the following relief: "back pay w/full benefits; front pay; monetary damages for trauma & stress & discrimination; and total restoration near new residence city/state." *Id.*

The court denied plaintiff's motion to appoint counsel on October 24, 2005. *See* docket no. 3. For reasons that are not clear from the record, summonses were not issued by the district court in Washington until January 2007, *see* docket nos. 6 and 7, and the complaint was not properly served until December 2007. *See* docket no. 22. On February 19, 2008, defendant Potter filed an answer and defendant EEOC moved to dismiss. *See* docket nos. 10 and 11. On March 18, 2008, the court dismissed the EEOC. *See* docket no. 12. On March 19, 2008, the court entered a "Minute order regarding initial disclosures, joint status report, and early settlement." *See* docket no. 14. This order set forth deadlines for initial disclosures of June 10, 2008 and directed the parties to confer and provide a discovery plan on June 17, 2008. *Id.* The parties submitted a joint status report on June 16, 2008, which summarized plaintiff's claims as follows:

> Plaintiff brought suit alleging that Defendant failed to employ her, terminated her employment, failed to promote her, harassed her and created a hostile work environment in violation of Title VII. Plaintiff has also alleged that Defendant failed to provide reasonable accommodation.

*See* docket no. 15. On June 26, 2008, the court entered a order which set a discovery completion date of January 20, 2009 and a trial date of May 18, 2009. *See* docket no. 16. After the case had

been pending for approximately 3 1/2 years, the court entered an order on March 19, 2009

transferring venue to the Western District of Michigan. *See* docket nos. 22 and 23.[17]

### 2. Proceedings in the Western District of Michigan

The parties filed another joint status report in this court on April 27, 2009. *See*

docket no. 31. On May 28, 2009, the parties consented to have this matter resolved by a magistrate

judge and the case was re-assigned to the undersigned. *See* docket no. 33. The court entered a case

management order setting a discovery deadline of September 30, 2009 and a jury trial date of March

29, 2010. On October 2, 2009, in response to a joint motion to extend deadlines filed by the parties,

the court amended the case management order to extend the discovery deadline to December 30,

2009 and rescheduled the trial to July 19, 2010. *See* docket no. 40. On December 31, 2009, in

response to a second motion to extend deadlines, the court amended the case management order to

extend the discovery deadline to January 29, 2010 and the dispositive motion deadline to February

28, 2010. *See* docket no. 42. The court denied a third request to extend discovery on February 17,

2010. *See* docket no. 52.

Potter subsequently moved for summary judgment. Given the confusing presentation

of the underlying facts at the motion hearing, the court directed the parties to submit a joint

chronology statement within 30 days after the hearing. *See* docket no. 84. The court granted the

parties three requests to extend the time for filing the joint chronology of facts. *See* docket nos. 89,

94 and 97. In addition, the court reviewed 234 pages of post-hearing exhibits submitted by plaintiff

---

[17] The parties' Joint Chronology incorrectly states that plaintiff's action was transferred to the Western District of Michigan on March 19, <u>2008</u>. *See* NCF at p. 45 (emphasis added).

and directed that portions of those exhibits be sealed. *See* docket nos. 90 and 91. On July 30, 2010, the parties filed a 48-page "Joint Chronology of Facts." *See* docket no. 98.

### E. Procedural posture

The parties presented inconsistent positions regarding plaintiff's present employment status with the Postal Service. The arbitrator's decision from July 13, 2003, determined that plaintiff "shall be reinstated to the rolls of the Postal Service on a Medical Leave of Absence without back pay, and the parties shall meet at the conclusion of the resolution of the EEO Reasonable Accommodation issue to discuss [plaintiff's] options for continued employment at that point." *See* July 31, 2003 arbitration decision at p. 24. While the Postal Service apparently takes the position that plaintiff's employment was terminated on April 16, 2009, that decision appears premature, because the reasonable accommodation issue has not yet been resolved. Accordingly, for purposes of this motion, the court views plaintiff's current status as set forth by the arbitrator, i.e., that she has been "reinstated to the rolls of the Postal Service on a Medical Leave of Absence without back pay."

### II. Plaintiff's motion seeking a stay of proceedings and other relief

As a preliminary matter, this court will address plaintiff's motion to stay the proceeding and for other relief (docket no. 100). This action was originally filed in the Western District of Washington in October 2005 and litigated in that court for nearly 3 1/2 years before it was transferred to this court in March 2009. This court entered a case management order on May 29, 2009. On two occasions, at the request of the parties, this court extended its case management deadlines. On February 26, 2010, in accordance with the case management order as amended, defendant filed the pending motion for summary judgment. Defendant filed 42 pages of deposition transcripts and over 130 pages of documents in support of his motion. See docket nos. 57-2 to 57-

17.  In lieu of filing a response, plaintiff filed a "motion to dismiss" defendant's motion, which the court denied.  *See* docket nos. 62 and 83.  Plaintiff also moved for an extension of time to file a response to defendant's motion, which the court granted.  *See* docket nos. 63 and 64.  Plaintiff then filed a 23-page answer to the motion for summary judgment with proposed exhibits.  *See* docket no. 72.  Plaintiff also filed a motion to "seal her case," including, but not limited to, all documents containing references to her mental and medical conditions. *See* docket nos. 73 and 77.  The court deferred ruling on her motion to seal until the hearing on defendant's motion for summary judgment.

During the hearing, it became clear that plaintiff was citing exhibits in addition to those submitted to the court.  After the hearing,  plaintiff reviewed her proposed exhibits and re-submitted 232 pages of redacted exhibits to be filed in the court record.  The court reviewed these re-submitted exhibits, sealed some of them, and made all of them part of the court record.  *See* docket nos. 90 and 91.  As previously discussed, the parties also subsequently submitted a 48-page "Joint Chronology," which set forth over 450  "controverted" and "non-controverted" facts.  *See* docket no. 98.

After litigating this matter for nearly half a decade, and submitting hundreds of pages of exhibits, plaintiff now asks the court to stay the proceedings to conduct further discovery and to collect information to support a new lawsuit which she intends to file in this district.  Plaintiff's motion is without merit.  It appears that plaintiff is proceeding under Fed. R. Civ. P.  56(f), which provides that  if a party opposing a motion for summary judgment "shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition," the court may deny the motion, order a continuance to obtain affidavits or discovery, or issue any other just order.  Plaintiff is not entitled to any relief under Rule 56(f).  Plaintiff has had literally years to assemble evidence

to support her claim.  Plaintiff filed a response to defendant's motion and appeared in court to argue her position.  The court accommodated plaintiff by allowing her to present exhibits after the hearing and to assemble a Joint Chronology of facts with defendant.  Plaintiff has had more than enough time to provide the court with a sufficient factual record to oppose defendant's motion for summary judgment, and there is no reason to delay ruling on it.  Furthermore, it appears that one purpose for plaintiff's motion is to accumulate additional facts to support another lawsuit.  The court will not facilitate plaintiff using the present action, which has been pending for virtually five years, as an investigative tool to develop claims for a new legal action against the Postal Service.  For these reasons, plaintiff's motion to stay the proceedings (docket no. 100) will be **DENIED**.

### III.    Legal standard for Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the standard for deciding a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case.  Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d  at 478-79 (citations omitted).  "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party."  *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

**IV.    Discussion**

**A.    Exhaustion of administrative remedies**

**1.    Hostile work environment claim**

One of plaintiff's claims in this action is that she was forced to work in a hostile work environment in December 1998, August 2001, and September 2001, in violation of Title VII. *See* docket no. 4. A federal employee claiming to be the subject of discrimination in violation of Title VII, may not seek relief in federal court unless administrative remedies first have been exhausted. *Hathcock v. Frank*, 958 F.2d 671, 675 (6th Cir. 1992). However, plaintiff's EEO complaint did not allege these claims of a hostile work environment. *See* docket no. 57-4.

Plaintiff's failure to include this allegation in her EEO complaint would not necessarily preclude a federal court from reviewing the claim. As a general rule, "where facts related with respect to the charged claim would prompt the EEOC to investigate a different, uncharged claim, the plaintiff is not precluded from bringing suit on that claim." *Weigel v. Baptist Hospital of East Tennessee*, 302 F.3d 367, 380 (6th Cir.2002) (quoting *Davis v. Sodexho, Cumberland College Cafeteria*, 157 F.3d 460, 463) (internal quotation marks omitted).

However, the question posed in *Weigel*, i.e., whether the investigation of the charged claim gave rise to other claims, has been answered in this case. Unlike *Weigel*, plaintiff did not simply file an EEO complaint listing various claims and then secure a right to sue letter long before the agency completed a review of her claims. *See Weigel*, 302 F.3d at 374-75 (EEOC issued a right to sue letter only 25 days after plaintiff mailed signed and mailed the EEOC charge). Rather, in this case, plaintiff pursued her administrative remedies for approximately three years, which resulted in

an investigation by the agency, a FAD and an EEOC opinion. Both the FAD and the EEOC opinion set forth the precise claims asserted by plaintiff.

Under these circumstances, the court concludes that plaintiff's claims in this action are limited to those claim exhausted in her administrative appeal. "Because exhaustion requirements are designed to deal with parties who do not want to exhaust, administrative law creates an incentive for these parties to do what they would otherwise prefer not to do, namely, to give the agency a fair and full opportunity to adjudicate their claims." *Woodford v. Ngo*, 548 U.S. 81, 90 (2006). "Administrative law does this by requiring proper exhaustion of administrative remedies, which means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits)." *Id.* at 90 (internal quotation marks omitted). "[A]s a general rule . . . courts should not topple over administrative decisions unless the administrative body not only has erred, but has erred against objection made at the time appropriate under its practice." *United States v. L. A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952). "[O]rderly procedure and good administration require that objections to the proceedings of an administrative agency be made while it has opportunity for correction in order to raise issues reviewable by the courts." *Id.*

"[T]he desirability of a court imposing a requirement of issue exhaustion depends on the degree to which the analogy to normal adversarial litigation applies in a particular administrative proceeding." *Sims v. Apfel*, 530 U.S. 103, 109 (2000). Thus, "[w]here the parties are expected to develop the issues in an adversarial administrative proceeding . . . the rationale for requiring issue exhaustion is at its greatest." *Id.*

EEOC proceedings are adversarial in nature. *See National Casualty Company v. Forge Industrial Staffing Incorporated*, 567 F.3d 871, 877 n.1 (7th Cir. 2009) (noting "that due to

the adversarial nature of the EEOC process, the conflict counsel doctrine is equally applicable to EEOC charges/proceedings as it is to a formal lawsuit"); *Winston v. Clough*, -- F. Supp. 2d --, 2010 WL 1875626 at *6 (D.D.C. 2010) (where court reviews a decision in an adversarial administrative proceeding, such as an appeal before the EEOC's OFO, the court may expect that the parties developed the issues below and "the rationale for requiring issue exhaustion is at its greatest") (quoting *Sims*, 530 U.S. at 110); *Tsai v. Rockefeller University*, 137 F. Supp. 2d 276, 282 (S.D. N.Y. 2001) ("[f]iling an EEOC charge is an adversarial proceeding"). Thus, the rationale for imposing issue exhaustion is applicable to proceedings, like plaintiff's, which have received a full administrative review.

Here, the FAD did not address the merits of plaintiff's workplace harassment claim, observing that plaintiff's claim involved an incident which occurred in 1997 (which was resolved in a previous EEOC settlement) and pointing out that plaintiff provided no specific information regarding the dates on which she was allegedly harassed in 2001 or 2001.[18] Accordingly, defendant is entitled to summary judgment on plaintiff's hostile work environment claims for 2001 and 2002 for lack of exhaustion of administrative remedies.

---

[18] The FAD provided in pertinent part as follows:

"According to the record and the request for EEO counseling, the incident of alleged harassment [by employee Dosie Maasen] occurred in 1997. The Complainant did not provide any testimony or corroborating evidence that Dosie Maasen harassed her in 2001 or 2002; nor did she provide any specific incidents with or without dates that he allegedly harassed her during the period in question. Other than the Complainant's own testimony that she was harassed, the incident that she alludes to occurred sometime in 1997."

FAD at pp. 13-14.

### 2. Plaintiff's "bid job" claim

Plaintiff's "bid job" claim is also unexhausted. The record reflects that the EEOC did not address plaintiff's "bid job" claim, because she withdrew the claim for consideration. *See Donna M. Castle-Ebright*, 2005 WL 1714465 at *1 and n. 2. Accordingly, defendant is entitled to summary judgment as to plaintiff's "bid job" claim for lack of exhaustion.

### B. Plaintiff's remaining claims

Plaintiff's discrimination, retaliation and rehabilitation claims arise from four discrete incidents: management's refusal to fill out OWCP forms on January 24 and January 29, 2002; management's denial of plaintiff's request for accommodation on January 26, 2002; and plaintiff's termination from employment on March 9, 2002. After reviewing the party's submissions, the court finds no evidence that a member of management refused to fill out OWCP forms on January 29, 2002. While plaintiff contends that Mr. Crudup "refused to assist [her] with workers compensation forms" on that date, *see* CF at p. 35, her citation in support of this claim, docket no. 91-9 at p. 5, does not support this contention. Rather, the cited document is a handwritten statement from January 29, 2002, in which Ray Boykins refers to an incident in October 2001 in which Mr. McFarland allegedly stated that he was not in a position to assist plaintiff (i.e., McFarland did not know how to fill out the OWCP paperwork, was not plaintiff's supervisor at the time of the incident, and did not know "what it was all about." *See* docket no. 91-9 at p. 5.[19] Plaintiff has presented no documentary or sworn evidence to establish that the January 29, 2002 OWCP incident involving Mr. Crudup occurred. Accordingly, defendant is entitled to summary judgment with respect to that

---

[19] The court notes that the alleged date of the incident with Mr. Crudup, January 29, 2002, is the date that Ray Boykins gave his statement regarding Mr. McFarland.

claim.  The court will review plaintiff's remaining claims as they relate to the incidents of January

24, January 26 and March 9, 2002.

### 1.        Disability discrimination under the Rehabilitation Act

The Rehabilitation Act prohibits the United States Postal Service from discriminating

against their employees on the basis of a disability. 29 U.S.C. § 794(a). *See DiCarlo v. Potter*, 358

F.3d 408, 418 (6th Cir. 2004).  Plaintiff has not presented any direct evidence of disability

discrimination.  Because plaintiff attempts to meet her burden by presenting circumstantial, as

opposed to direct, evidence of discrimination, the court applies the familiar three-step

burden-shifting framework originally articulated in *McDonnell Douglas Corporation v. Green*, 411

U.S. 792 (1973) and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248  (1981).

*Jones v. Potter*, 488 F.3d 397, 403-04 (6th Cir. 2007).

> The initial burden rests with the plaintiff to establish a prima facie case of
> discrimination.  If the plaintiff establishes a prima facie case, the burden shifts to the
> employer to articulate a legitimate, nondiscriminatory reason for the challenged
> employment decision.  Should the employer carry this burden, then the burden
> returns to the plaintiff to prove by a preponderance of the evidence that the
> employer's proffered reason was in fact a pretext designed to mask illegal
> discrimination.

*Id.* at 404 (internal citations omitted).  Plaintiff can defeat summary judgment only if her evidence

is sufficient to create a genuine dispute at each stage of the inquiry.  *Id.*

To establish a prima facie case of disability discrimination under the Rehabilitation

Act, plaintiff must establish each of the following five elements:  (1) that she is disabled; (2) that

she is otherwise qualified for the job, with or without reasonable accommodation, (3) that she

suffered an adverse employment action, (4) that her employer knew or had reason to know of her

disability; and (5) that, following the adverse employment action, either she was replaced by a

nondisabled person or her position remained open. *Id.* Plaintiff may also satisfy the final element

by showing that similarly situated non-protected employees were treated more favorably. *Id.*

Viewing the evidence in the light most favorable to plaintiff, the court concludes that

plaintiff has failed to establish a *prima facie* case of disability discrimination because she is not a

"disabled person."

> "To be 'disabled' for the . . . Rehabilitation Act, an individual must (1)
> have a physical or mental impairment which 'substantially limits' him or her in at
> least one 'major life activity,' (2) have a record of such an impairment, or (3) be
> regarded as having such an impairment." *Mahon v. Crowell*, 295 F.3d 585, 589 (6th
> Cir.2002). "Major life activities" include "functions such as caring for one's self,
> performing manual tasks, walking, seeing, hearing, speaking, breathing, learning,
> and working." *Id.* at 590 (quoting 45 C.F.R. § 84.3(j)(2)(ii)).

*DiCarlo*, 358 F.3d at 418. "Major life activities" refers to activities "that are of central importance

to daily life." *Toyota Motor Manufacturing, Ky., Inc. v. Williams*, 534 U.S. 184, 197 (2002). "A

substantial limitation of such an activity exists when the individual's ability to perform that activity

is limited to a large degree." *Brady v. Potter*, 273 Fed. Appx. 498, 502-04 (6th Cir. 2008), citing

*Toyota Motor Manufacturing*, 534 U.S. at 196-97. "It is not enough for the impairment to cause

merely moderate or intermittent interruptions in the performance of the activity." *Brady*, 273 Fed.

Appx. 502-03, citing *Mahon*, 295 F.3d at 590-91 (*citing Toyota Motor Manufacturing*, 534 U.S. at

196-97).

The thrust of plaintiff's claim is that she is disabled because she cannot be employed

at the Postal Service because another employee, Dosie Maasen, triggers her disabling PTSD.

Plaintiff has failed to demonstrate that her condition is a disability under the Rehabilitation Act.

Plaintiff admitted that she could have continued her current position in November 2001 if she was

not working with or near Dosie Maasen. *See* Leitner Dep. at pp. 28, 66 and 79-80. Similarly, to the

extent that plaintiff claimed that she suffered from "broken sleep" along with panic attacks in 2001, she attributed this to her contact with Dosie Maasen, and testified that she could avoid the panic attacks by avoiding Maasen. *Id.* at p. 43.

"To be substantially limited in the major life activity of working . . . one must be precluded from more than one type of job, a specialized job, or a particular job of choice. *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 492 (1999) (addressing whether the plaintiff was disabled under analogous provision of Americans with Disabilities Act). "[A] personality conflict between an employee and a supervisor - even one that triggers the employee's depression - is not enough to establish that the employee is disabled, so long as the employee could still perform the job under a different supervisor." *Schneiker v. Fortis Insurance Company*, 200 F.3d 1055, 1062 (7th Cir. 2000) (same). The major life activity of working is not "substantially limited" if the plaintiff merely cannot work under a certain supervisor because of anxiety and stress. *Weiler v. Household Finance Corporation*, 101 F.3d 519, 524 (7th Cir. 1996) (same). "If [the plaintiff] can do the same job for another supervisor, he can do the job" and does not qualify as a disabled person under the statute. *Id.* Furthermore, "[i]f the impact of an impairment can be eliminated by changing the address at which an individual works, that impairment is neither permanent nor long term." *Haynes v. Williams*, 392 F.3d 478, 483 (D. C. Cir. 2004). *See e.g., Rand v. Geithner*, 609 F. Supp. 2d 97, 102-04 (D.D.C. 2009) (Treasury Department employee was not substantially limited in her ability to work under the Rehabilitation Act, where her adjustment disorder and mixed anxiety and depressed mood allegedly resulted from her interactions with a former supervisor; to the extent her impairment interfered with the ability to work, it only limited the plaintiff to work in a particular office environment).

The record reflects that plaintiff's impairment is a direct result of working with or near one particular employee. Plaintiff is not considered disabled under the Rehabilitation Act where her condition is allegedly due to her interaction with a single individual at the workplace. *See Haynes*, 392 F.3d at 483; *Schneiker*, 200 F.3d at1062; *Weiler*, 101 F.3d at 524; *Rand*, 609 F. Supp. 2d at 102-04. Accordingly, defendant is entitled to summary judgment with respect to plaintiff's claim of disability discrimination.

**2.      Plaintiff's failure to accommodate claim under the Rehabilitation Act**

Plaintiff also claims that defendant violation the Rehabilitation Act by failing to accommodate her disability. A similar burden-shifting framework applies. In order for plaintiff to prevail on her claim of discrimination based upon the failure to accommodate, she must establish a *prima facie* case that: (1) she is an individual with a handicap; (2) she is qualified for the position; (3) the agency was aware of her disability; (4) an accommodation was needed, i.e., a causal relationship existed between the disability and the request for accommodation; and (5) the agency failed to provide the necessary accommodation. *DiCarlo*, 358 F.3d at 419, citing *Gaines v. Runyon*, 107 F.3d 1171, 1175-76 (6th Cir.1997). "Once the plaintiff has presented a prima facie case, the burden shifts to the employer to demonstrate that the employee cannot reasonably be accommodated, because the accommodation would impose an undue hardship on the operation of its programs." *Id.* For the reasons discussed in § IV.B.1, *supra*, plaintiff cannot establish a *prima facie* case for a failure to accommodate claim under the Rehabilitation Act, because she was not considered disabled under the Act. Defendant is also entitled to summary judgment on plaintiff's failure to accommodate claim.

### 3. Retaliation claim

Finally, defendant seeks summary judgment on plaintiff's claim for retaliation. The motion is problematic, because plaintiff's complaint does not allege a claim for retaliation. The only mention of retaliation appears in the joint status report filed in this court, where plaintiff's extended narrative includes a statement that the Postal Service "unjustly terminated her after she threatened to file an OWCP claim and an EEOC." *See* Joint Status Report at ¶ 5 (docket no. 31).[20] The parties were given 30 days to amend their pleadings after the Rule 16 Scheduling Conference. *See* docket nos. 32 and 34. However, plaintiff did not seek to amend her complaint during that time period, or at any other time, to include a retaliation claim.

The record reflects that plaintiff raised a retaliation issue in the administrative proceedings. However, the claim raised in the agency was based upon a prior EEO proceeding rather than threats to file an OWCP claim or an EEO complaint in 2001 or 2002. *See* FAD at p. 6 (in rejecting plaintiff's retaliation claim, the agency noted that the "[t]estimony and record evidence revealed the responsible management officials in this complaint were not involved in the Complainant's prior EEO activity"). Furthermore, the arguments presented by the parties on this motion do not agree on the nature of the underlying retaliation claim. Defendant struggled to find a retaliation claim in the complaint, and subsequently argued that the protected activity consisted

---

[20] The court notes that the Joint Status Report filed in the Western District of Washington on June 16, 2008, did *not* refer to a retaliation claim. At that time, the parties characterized the "nature of the case" as follows:

> Plaintiff has brought suit alleging that Defendant failed to employ her, terminated her employment, failed to promote her, harassed her and created a hostile work environment in violation of Title VII. Plaintiff has also alleged that Defendant failed to provide reasonable accommodation.

*See* docket no. 15.

of plaintiff's threat to file an OWCP claim and plaintiff's previous filing of an EEO complaint in 1998. For her part, plaintiff argued that the protected activity consisted of her threats to file EEO claims in 2001.

The court has a duty to read a *pro se* plaintiff's complaint indulgently. *See Haines v. Kerner*, 404 U.S. 519 (1972); *Kent v. Johnson*, 821 F. 2d 1220, 1223-24 (6th Cir. 1987). However, the leniency standard granted to *pro se* litigants is not boundless. *Martin v. Overton*, 391 F. 3d 710, 714 (6th Cir. 2004). "*Pro se* plaintiffs are treated to less stringent standards, but 'they are not automatically entitled to take every case to trial.'" *Martin*, 391 F.3d at 714, quoting *Pilgrim v. Littlefield*, 92 F.3d 413, 416 (6th Cir.1996). In this regard, "[l]iberal construction does not require a court to conjure allegations on a litigant's behalf." *Erwin v. Edwards*, 22 Fed.Appx. 579, 580 (6th Cir. 2001). While plaintiff raised a retaliation claim in the administrative proceedings, her complaint does not contain the word "retaliation" or any allegations that would give defendant notice of alleged retaliation. Because there is no retaliation claim pending before the court, and plaintiff took no steps to amend her complaint to include a retaliation claim, defendant's motion for summary judgment as to the retaliation claim, although it appears moot, will be granted.

### V.    Conclusion

Accordingly, defendant's motion for summary judgment (docket no. 56) will be **GRANTED**. An order consistent with this opinion shall be issued forthwith.


Dated:  September 29, 2010                    /s/ Hugh W. Brenneman, Jr.
                                             HUGH W. BRENNEMAN, JR.
                                             United States Magistrate Judge